FILED BY _____ _____ D.C.

05 OCT 24  AM 7: 0?

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN. MEMPHIS

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

ALMA ROBINSON,

      Plaintiff,

v.

FIRST HORIZON EQUITY LENDING,

      Defendant.

Case No.: 04-2333 D V

---

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

---

Before the Court is Defendant, First Horizon Equity Lending's, ("FHEL"), motion for summary judgment as to Plaintiff's age and race discrimination claims. Defendant alleges that Plaintiff was separated from her employment as a pre-qualified underwriter for legitimate nondiscriminatory performance reasons. Plaintiff asserts that Defendant discriminated against her based on her age and race. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons stated herein, the Court GRANTS Defendant's motion for summary judgment.

## I. FACTS

Plaintiff was hired by First Tennessee in 1984 to work as a clerk in the Merchant Operations department. In 1996 or 1997, Plaintiff worked as a pre-arbitration analyst for First Tennessee until she was hired as a pre-qualified underwriter with the predecessor of FHEL.

As a pre-qualified underwriter, Plaintiff's job duties included reviewing information submitted by customers applying for loans to determine whether customers qualified for certain loans. Plaintiff's reviewed loan applications in the context of certain applicable guidelines and

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on 10-24-05



regulations. Plaintiff received training from FHEL regarding her various job duties. As changes occurred, Plaintiff received additional training. During the course of Plaintiff's employment, she admittedly made numerous errors resulting in several non qualifying loans being approved.

The facts set forth herein from the record are uncontroverted.[1]

1. Plaintiff, Alma Robinson, was hired by First Tennessee in 1984 to work as a clerk in the Merchant Operations area. In approximately 1996 or 1997, Plaintiff became a pre-arbitration analyst for First Tennessee. In 1998, the Merchant Operations area, including the job Plaintiff held, was moved out of state. Around that time, Plaintiff applied and was hired as a pre-qualified underwriter with the predecessor First Horizon, [Gulf Pacific]. Plaintiff had no experience in underwriting at the time she was hired a pre-qualified underwriter. (Pl. Dep., p. 23, ll. 11-19; p. 23, l. 23- p. 24, l. 1; p. 24, ll. 13-16; p. 25, ll. 1-3; p. 26, l.20 - p. 27, l. 14; p. 30, ll. 2-10; p. 30, l. 18- p. 31, l.2)

2. As a pre-qualified underwriter, Plaintiff's job responsibilities included reviewing information submitted by customers applying for loans to determine whether the customers qualified for the loan under government and First Horizon guidelines provided to her. After Plaintiff reviewed the loan applications, she would determine whether the applicant met the qualifications to receive the loan. If Plaintiff determined that the applicant met the qualifications pursuant to the guidelines, Plaintiff would pre-qualify the loan, and the customer would be notified. After Plaintiff reviewed the loan application information, it would be sent to other underwriters for review and quality control. (Pl. Dep., p. 31, ll. 3-10; p. 48, l. 16 - p. 52, l.25; p. 48, ll. 4-7; p. 59, ll. 20-22).

3. Plaintiff had a good relationship with all of her supervisors and co-workers at First Horizon. (P. Dep., p. 33, ll. 8-19).

4. While Plaintiff's supervisor changed depending upon the type of loan she was working on, Lisa Manley was one of Plaintiff's supervisors at First Horizon. Because another supervisor was out on leave, Lisa Manley was supervising Plaintiff during 2003 through the time that Plaintiff stopped working for First Horizon. (Pl. Dep. P. 34, l. 7 - p. 35, l.23; p. 102, ll. 10-20).

5. The guidelines that Plaintiff was to utilize in reviewing loan applications changed often during her employment at First Horizon. Plaintiff and other underwriters were

---

[1] These facts are set forth verbatim from Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment.

trained on all changes in guidelines and policies and given updated notes regarding the changes. If Plaintiff had a question about a change in a guideline or policy, she could ask her supervisor for an explanation, and the supervisor would answer the questions. (Pl. Dep., p. 41, 1. 22 - p. 46, 1.1).

6. When Plaintiff pre-qualified a loan that did not meet the applicable guidelines, the error would be referred to as a "customer service issue." When Plaintiff made such an error, she would have to complete a "loan variance form" once the error was discovered so that the errors could be tracked.   The "loan variance form" was developed and utilized after Plaintiff began working as a pre-qualified underwriter. (Pl. Dep., p. 46, 1. 22 - p. 47, 1. 7; p. 61, 1. 12 - p. 64, 1.9).

7. Beginning in late 2002, and early 2003, there were numerous instances of errors made by Plaintiff in which she pre-qualified loans for applicants who did not meet the guidelines to qualify for the loan. Plaintiff's supervisor, Lisa Manley, advised Plaintiff of the errors once they were discovered and discussed the errors with Plaintiff. Additionally, there were training classes and meetings concerning changes in guidelines at which the correct procedures and error avoidance were discussed. (Pl. Dep., p. 61, 1. 16 - p. 63, 1. 21; p. 64, 1. 10 - p. 86, 1. 9; Exhibit 11 to Pl. Dep.; Declaration of Lisa Manley ¶ 4).

8. In November 2002, or January 2003, Plaintiff incorrectly approved a loan for stated income where the borrowers operated their home as an assisted living facility with income of $13,300 monthly.  Commercial use of the home should have been questioned by Plaintiff, but was not. (Pl. Dep., p. 84, 1. 12 - p. 85, 1. 1 p. 63, ll. 6-21; Exhibit 11 to Pl. Dep.).

9. During March and April 2003, Plaintiff had at least seven (7) "customer service issues" or instances where she pre-qualified loans that did not meet the applicable guidelines and regulations.  These errors included: approving loans for an applicant that did not have the minimum credit score for the loans; approving loans for an applicant with a debt to income ratios that were too high; failing to include a first mortgage that was disclosed on the loan application in the applicant's debt to income ratio and incorrectly approving a loan as a result; approving a loan where the value of the single family home being financed was not high enough to support the amount of the loan; and approving a loan on stated income for a second home when stated income loans were only available for a primary residence. (Pl. Dep., p. 64, 1. 10 - p. 81, 1. 13; p. 83, 1.20 - p. 84, 1.11; Exhibits 2, 3, 4, 5, 6, 7, 8, and 11 to Pl. Dep.).

10. On May 8, 2003, Plaintiff was provided with and signed a written warning detailing the performance issues and underwriting errors she had made during late 2002 - April, 2003. In that written warning, Plaintiff was advised that she needed "to fully commit herself to [her] job, so that we will not have to go to the third step in

3

our progressive discipline procedure. The third step is termination." (Pl. Dep., p. 83, ll. 13-19; Exhibit 11 to Pl. Dep.).

11.  In July and August 2003, Plaintiff committed at least three (3) more "customer service issues" when she approved loans in excess of the maximum amounts for which the applicants qualified, and incorrectly approved a loan available only for primary residences for an applicant's second home. (Pl. Dep., p. 81, ll. 14-25; p. 101, l. 5 - p. 106, l. 10; p. 109, ll. 9-25; Exhibits 9, 12, and 13 to Pl. Dep.).

12.  On August 27, 2003, Plaintiff was advised that she should start looking for another position within First Tennessee because she would no longer be working as an underwriter.  Plaintiff was advised that she could use two weeks of time during which she would be paid to attempt to locate another position within First Tennessee. Plaintiff was subsequently told that she could use her vacation and personal time to remain as an employee for five (5) weeks during which time she could attempt to locate another position within First Tennessee. Thus, while Plaintiff did not actually perform work for First Horizon after August 27, 2003, her termination was not effective until approximately October 7, 2003. (Pl. Dep., p. 107, ll. 13-24; p. 110, l.1- p. 112, l. 11; p. 115, ll. 5-16).

13.  The reason Plaintiff was no longer allowed to work in underwriting was the excessive underwriting errors she committed during 2003 that resulted in financial losses for the Bank. Neither Plaintiff's age nor race played any part in the reasons for her termination.  Plaintiff understood that the reason for her termination was performance.  (Pl. Dep., p. 109, ll. 3-8; p. 110, ll. 1-21; p. 115, ll. 17-20; Declaration of Lisa Manley, ¶ 6).

14.  Plaintiff does not know how many errors other underwriters in her department made. Plaintiff admits that she made errors prior to 2003. (Pl. Dep., p. 120, ll. 3-22).

15.  Gale Gordon was a white employee who was terminated around the same time as Plaintiff for multiple underwriting errors and deficient job performance. Unlike Plaintiff, Ms. Gordon was not provided with several weeks of pay prior to the effective date of her termination to utilize in attempting to locate another position within First Tennessee.  Instead, Ms. Gordon's termination was effective immediately, and she was not allowed time to remain as an employee and attempt to find another position with First Tennessee. (Pl. Dep., p. 118, l. 10 - p. 119, l.5; Declaration of Lisa Manley, ¶ 8).

16.  The position Plaintiff held prior to her termination was not filled after her termination. The department in which Plaintiff had worked was eliminated shortly after Plaintiff's termination. (Pl. Dep., p. 115, l. 25 - p. 116, l. 6; Declaration of

4

Lisa Manley, ¶ 7).

17.  Plaintiff was aware of First Tennessee's and First Horizon's equal employment opportunity policies. Plaintiff received a handbook the first day she worked for First Tennessee and knows that the proper procedure for making any complaint of discrimination is set forth in the handbook. (Pl. Dep., p. 54, 1. 22 - p. 56, 1. 17).

18.  When Plaintiff went to the Operations Manager, Terry Renault, about her concerns, she made no mention of race, age, or any other kind of discrimination. (Pl. Dep., p. 100, ll. 11-16).

19.  Plaintiff makes no allegations of any comments related to her race or age during her employment with First Horizon. (See, Amended Complaint).

Plaintiff's amended complaint provides in relevant part:

1.  This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. And 42 U.S.C. § 1981 to redress discrimination on the grounds of race and the Age Discrimination in Employment Act (ADEA). This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

2.  Plaintiff Alma Robinson is a black citizen of the United States who is over the age of 40 and is a resident of Memphis, Tennessee.

3.  Defendant First Horizon Equity Lending is a mortgage lender with headquarters at 1755 Lynnfield Road, Building D, Memphis, Tennessee 38119 (hereinafter "First Horizon").

4.  Plaintiff was terminated for alleged errors even though white employees were retained who had worse evaluations, made more errors, and were below the age of 40.

5.  Plaintiff filed a timely charge with the EEOC (No. 250-2003-03097) and received a Notice of Right to Sue dated February 10, 2004.

Plaintiff's Amended Complaint, ¶¶ 1-5.

## II. **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

5

material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c). In other words, summary judgment is appropriately granted "against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment may satisfy its initial burden of proving the absence

of a genuine issue of material fact by showing that there is a lack of evidence to support the

nonmoving party's case. Id. at 325. This in turn may be accomplished by submitting affirmative

evidence negating an essential element of the nonmoving party's claim, or by attacking the

opponent's evidence to show why it does not support a judgment for the nonmoving party. 10a

Charles A. Wright et al., Federal Practice and Procedure § 2727, at 35 (2d ed. Supp. 1996).

Facts must be presented to the court for evaluation. Kalamazoo River Study Group v.

Rockwell Int'l, 171 F.3d 1065, 1068 (6th Cir. 1998). The court may consider any material that would

be admissible or usable at trial. 10a Charles A. Wright et al., Federal Practice and Procedure § 2721,

at 40 (2d ed. 1983). Although hearsay evidence may not be considered on a motion for summary

judgment, Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 927 (6th Cir.

1999), evidentiary materials presented to avoid summary judgment otherwise need not be in a form

that would be admissible at trial. Celotex, 477 U.S. at 324; Thaddeus-X v. Blatter, 175 F.3d 378,

400 (6th Cir. 1999).

In evaluating a motion for summary judgment, all the evidence and facts must be viewed in

a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Walbourn v. Erie County Care Facility,

150 F.3d 584, 588 (6th Cir. 1998). Justifiable inferences based on facts are also to be drawn in favor of the non-movant. Kalamazoo River, 171 F.3d at 1068.

Once a properly supported motion for summary judgment has been made, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.

## III.  TITLE VII STANDARD

Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Where the plaintiff-employee offers no direct evidence of unlawful discriminatory intent, the order and allocation of burdens of proof are as established by the evidentiary framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). See McDonald v. Union Camp Corp., 898 F.2d 1155, 1159 (6th Cir. 1990).

Under the McDonnell Douglas burden shifting framework, the plaintiff must first prove a prima facie case of discrimination by a preponderance of the evidence. Wilson v. Stroh Cos., 952 F.2d 942, 945 (6th Cir. 1992) (citing Burdine, 450 U.S. 252-53). If the plaintiff succeeds, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the

adverse employment action. Galbraith v. N. Telecom, Inc., 944 F.2d 275, 279 (6th Cir. 1991) (citing Burdine, 450 U.S. at 253), cert. denied, 503 U.S. 945, 112 S.Ct. 1497, 117 L.Ed.2d 637 (1992). Once the employer provides a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff may still prevail by establishing by a preponderance of the evidence that the employer's claimed rationale was a pretext for illegal discrimination. Wilson, 952 F.2d at 945; Mitchell v. Toledo Hosp., 964 F.2d 577, 584 (6th Cir. 1992).

In order to meet her first burden and establish a prima facie case of race discrimination, the plaintiff must prove four elements:

A. that she is a member of a protected group;

B. that she was subject to an adverse employment action;

C. that she was qualified for the position sought or held; and

D. that she was replaced by a person outside the protected class.

McDonnell Douglas, 411 U.S. at 802; Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 801 (6th Cir. 1994). The fourth element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably. Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1246 (6th Cir. 1995). In order for two or more employees to be considered similarly situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of her employment situation were "nearly identical" to those of the non-minority employees she alleges were treated more favorably. Pierce, 40 F.3d at 802.

## IV. ADEA STANDARD

The Age Discrimination in Employment Act, 29 U.S.C. §621, *et seq.*, prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or

8

privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff in an ADEA case has the same burden as that of a plaintiff in a Title VII employment discrimination case. A plaintiff may establish a violation of the ADEA through either direct evidence or indirect evidence. Where the plaintiff does not offer direct evidence of age discrimination, the court will apply the McDonnell Douglas burden shifting standard. To establish a prima facie case of age discrimination a plaintiff must show that:

> A. she was over the age of forty;
>
> B. she was qualified for the position;
>
> C. she was subjected to an adverse employment action; and
>
> D. she was treated worse than a younger individual.

Barnhart v. Pickrel, Schaeffer & Ebeling, 12 F.3d 1382, 1390 (6th Cir. 1993); McDonald v. Union Camp Corp., 898 F.2d 1155, 1160 (6th Cir. 1990).

## V. ANALYSIS

It is unlawful for a qualified employer to discriminate against an employee based on race or age. Plaintiff must show that age or race was a determining factor in the employer's decision. See Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1081 (6th Cir. 1994). However, employers are not prohibited from applying work place rules and regulations to employees in protected categories. The district court does not sit as a super human resources manager and must give deference to employers to impose nondiscriminatory performance rules for employees.

In the instant case, Plaintiff has shown that she is a member of the protected group for both her race and age claims and that she was subject to an adverse employment action. The Court will not address those prongs further. Plaintiff has not shown that she was replaced by a person outside

9

of the protected class.

Plaintiff has presented no direct evidence of age or race discrimination. See <u>McDonald v. Union Camp</u>, 898 F.2d 1155 (6th Cir. 1990). The record is devoid of any race or age based comments. Moreover, Plaintiff concedes that she never voiced any concerns regarding race or age to her supervisors or managers.

Plaintiff has not demonstrated that she was otherwise qualified for the job. The test for determining whether an employee is qualified for a particular position is whether or not the employee's job performance met the employer's legitimate expectations. <u>McDonald v. Union Camp</u>, <u>supra</u>. In the instant case, it is undisputed that Plaintiff made numerous errors in the loan approval process. Rather, the record shows that Plaintiff's performance fell below the employer's acceptable standard. Plaintiff was placed in the employers progressive discipline process and continued to make errors. Ultimately, Plaintiff was removed from the position and advised to look for another position within First Tennessee.

Thus, Defendant has articulated a non discriminatory reason for its action. Plaintiff has not produced any evidence to rebut Defendant's stated nondiscriminatory reason.

Plaintiff has produced no evidence that similarly situated persons were treated more favorably. Instead, the evidence is just the converse. <u>See</u> <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir. 1998). It appears that Plaintiff was treated more favorably than the comparable employee, Gale Gordon.

Finally, Plaintiff has not presented evidence that Defendant's stated reasons were pretextual. In fact, through Plaintiff's deposition testimony, Plaintiff's testimony confirms the validity of Defendant's stated reasons.

## V. <u>CONCLUSION</u>

Because of the absence of probative evidence from which a rational jury could find for Plaintiff, the Court finds that no genuine issue of fact exists and enters judgment for Defendant. Defendant's motion for summary judgment is GRANTED.

**IT IS SO ORDERED** this _21_ day of _October_ , 2005.


BERNICE BOUIE DONALD
UNITED STATES DISTRICT JUDGE

11

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 40 in case 2:04-CV-02333 was distributed by fax, mail, or direct printing on October 24, 2005 to the parties listed.

---

Frederick J. Lewis
LEWIS FISHER HENDERSON & CLAXTON, LLP
6410 Poplar Ave.
Ste. 300
Memphis, TN 38119

Richard B. Fields
LAW OFFICE OF RICHARD B. FIELDS
688 Jefferson Ave.
Memphis, TN 38105--193

Craig Cowart
LEWIS FISHER HENDERSON & CLAXTON, LLP
6410 Poplar Ave.
Ste. 300
Memphis, TN 38119

Honorable Bernice Donald
US DISTRICT COURT